UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

DAVID EGGLESTON,                        )
                                        )
      Plaintiff,                     )
                                        )
        v.                      )    Civil Action No. 1:23-cv-1659 (MSN/WEF)
                                        )
CATHY SURGEY                            )
                                        )
and                                     )
                                        )
CAZ CRAFFY,                             )
                                        )
      Defendants.                    )
_____ )

## Report and Recommendation

This matter is before the Court on Plaintiff David Eggleston's Second Motion for Default Judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 55 as to Defendant Cathy Surgey and Defendant Caz Craffy (Dkt. 37). Pursuant to 28 U.S.C. § 636(b)(1)(C), the undersigned United States Magistrate Judge has reviewed the Motion and relevant pleadings and submits these proposed findings of fact and recommendations to the Court, a copy of which will be provided to all interested parties.

For the reasons set forth below, the undersigned recommends **GRANTING IN PART** and **DENYING IN PART** Plaintiff's Second Motion for Default Judgment (Dkt. 37) and **AWARDING** Plaintiff the relief set forth below.

## Procedural and Factual Background

*The Complaint*

Plaintiff David Eggleston initiated this civil action against Defendants Cathy Surgey and Caz Craffy on December 6, 2023. Compl., Dkt. 1. In short, the Complaint alleges that Plaintiff, a

72-year-old resident of Fairfax County, was the victim of a malicious yet well-executed scheme to defraud him out of money and cryptocurrency. *Id.* The schemers tricked Plaintiff into believing that he had been recruited, and after a series of fake interviews, was hired to be President of U.S. operations for ARATA Corporation which is a reputable Japanese company that sells household goods. *Id.*, ¶¶ 9-12. Once "hired" for this position, Plaintiff was told he would have to purchase office equipment but that he would be reimbursed for these expenses. *Id.*, ¶¶ 12-13. Plaintiff was then directed to transfer money and cryptocurrency into the accounts of Defendants Surgey and Craffy, which he did. *Id.*, ¶¶ 14-20. During this period, Defendant Craffy communicated with Plaintiff and assured him that he had made similar payments to ARATA. *Id.*, ¶ 15. Plaintiff ultimately learned that the job offer was a hoax, that he had been swindled out of money and cryptocurrency, and as alleged in the Complaint that the Defendants were knowing participants in the scheme. *Id.*

Specifically, the Complaint alleges Virginia common law violations of fraud in the inducement (Count I) and actual fraud (Count II) as well as conspiracy to injure Plaintiff in violation of Va. Code §§ 18.2-499 and 500 or, in the alternative, conspiracy under the Virginia common law (Count III). *Id.*, ¶¶ 27-40. The Complaint seeks compensatory damages in the amount of $63,451.22 under Counts I and II, punitive damages of $350,000 under Counts I and II,[1] treble damages in the amount of $190,355.22 under Count III,[2] reasonable attorney's fees under Count III,[3] as well as court costs, expenses, prejudgment interest and post-judgment interest. *Id.*, Prayer for Relief at p. 14.

---

[1]    *See* Va. Code § 8.01-38.1.

[2]    *See* Va. Code § 18.2-500.

[3]    *See* Va. Code § 18.2-500.

*Service of Process on Defendant Surgey*

Under Fed. R. Civ. P. 4(e), a plaintiff may serve "an individual–other than a minor, incompetent person, or a person whose waiver has been filed . . . in a judicial district of the United States by . . . delivering a copy of the summons and of the complaint to the individual personally." On January 2, 2024, Defendant Surgey was personally served with the Summons and Complaint at her residence in Tennessee in accordance with Rule 4(e)(2)(A).  Dkt. 6.  On January 11, 2024, nine (9) days after she was personally served, Defendant Surgey sent a letter to Plaintiff's counsel in which she acknowledged having been served with the Summons and Complaint in this case. Dkts. 18 at p. 3; 38 at p. 5.  The undersigned finds that service on Defendant Surgey was proper.[4]

*Service of Process on Defendant Craffy*

Under Fed. R. Civ. P. 4(e), a plaintiff may also serve "an individual-other than a minor, incompetent person, or a person whose waiver has been filed . . . in a judicial district of the United States by . . . leaving a copy of [the summons and complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there."  Fed. R. Civ. P. 4(e)(2)(B).  On December 22, 2023, a process server left a copy of the Summons and Complaint at Defendant Craffy's residence in Colt's Neck, New Jersey with a person who identified herself as Cathy Surgey and represented that she was Defendant Craffy's sister.  Dkt. 5.

Cathy Surgey is the same name and the same spelling as Defendant Craffy's co-defendant. Defendant Surgey was served by a different process server at her residence in Tennessee, negating the possibility that the same process server confused the names.  *See* Dkt. 6.  As discussed below, Defendant Craffy maintains he does not know Defendant Surgey.  Dkts. 7, 38 at p 2.  Moreover,

---

[4]    Given the nature of the communications Defendant Surgey has had with Plaintiff's counsel and the Court, the undersigned finds she is neither a minor nor incompetent.

in a conversation with Plaintiff's counsel on January 11, 2024, Defendant Craffy stated that the summons was served on his wife, not Defendant Surgey, and that he did not know Defendant Surgey. Dkts. 7, 38 at p 2. As discussed below, the undersigned finds by a preponderance of the evidence this claim to be untrue.[5]

The undersigned further finds that even though the Summons and Complaint were left with Defendant Surgey, who resides in Tennessee and not with Defendant Craffy in New Jersey, Craffy ultimately received the Summons and Complaint.[6] Defendant Craffy has actual knowledge of the substance of the Complaint[7] and, as discussed below, filed an Answer to the Complaint.

*Defendant Craffy's January 11, 2024 Phone Call with Plaintiff's Counsel*

On January 11, 2024, twenty (20) days after service was executed at Defendant Craffy's residence, Defendant Craffy contacted Plaintiff's counsel by telephone. Dkts. 5, 18 at p. 2, 38 at p. 2. During this conversation, Defendant Craffy told Plaintiff's counsel that he was unrepresented in this matter. Dkts. 8 at p. 2, 38 at p. 2. Defendant Craffy also stated that (i) he was a disabled veteran;[8] (ii) while he did receive funds from Plaintiff, he used those funds along with $8,000 to

---

[5]    Also discussed below, the undersigned finds by a preponderance of the evidence that Defendant Craffy's self-serving exculpatory statements are false and that he knowingly participated in the scheme to defraud Plaintiff.

[6]    Similarly, given the nature of the communications Defendant Craffy has had with Plaintiff's counsel and the Court, as well as information related to his fraud conviction in the District of New Jersey, the undersigned finds he is neither a minor nor incompetent.

[7]    "When the process gives the defendant actual notice of the pendency of the action, the rules, in general, are entitled to a liberal construction. When there is actual notice, every technical violation of the rule or failure of strict compliance may not invalidate the service of process." *Armco, Inc. v. Penrod-Stauffer Bldg. Systems, Inc.*, 733 F.2d 1087, 1089 (4th Cir. 1984). Here, Defendant Craffy clearly received a copy of the Summons and Complaint as evidenced by his subsequent communications with Plaintiff's counsel and the Court.

[8]    During the conversation, Plaintiff's counsel requested that Defendant Craffy provide his DD Form 214 (Report of Separation and Discharge Papers from the Military), but Craffy failed to do so.

4

$10,000 of his own money to purchase Bitcoin through Coinbase and sent the Bitcoin to an individual employed by ARATA Corporation; (iii) he was formerly a financial advisor and an independent broker; (iv) his home valued at $2,000,000 was in foreclosure;[9] and (v) he believed that he too was a victim of the scheme to defraud alleged by the Plaintiff. Dkts 7, at pp. 18, 38.

*Plaintiff's Motion to Extend Time for Defendant Craffy to Answer*

In light of the representations Defendant Craffy made to Plaintiff's counsel during their call of January 11, 2024, the following day Plaintiff filed a motion to extend the time for Craffy to answer, plead or otherwise respond to the Complaint. Dkt. 7. The purpose of the extension was to allow Defendant Craffy time to provide documents to Plaintiff's counsel that supported his claim that he too was a victim of the fraud. *Id*. The undersigned granted Plaintiff's motion and extended the time for Defendant Craffy to respond to the Complaint to February 2, 2024. Dkt. 8. The date for Defendant Surgey to respond to the Complaint remained January 23, 2024. *Id*. Defendant Craffy provided some documentation to Plaintiff's counsel, but counsel did not believe the documents supported Craffy's claim that he too was a victim of the fraud. Dkt. 38, at p. 3.

*Defendant Surgey's January 21, 2024 Letter to Plaintiff's Counsel*

On January 21, 2024, Defendant Surgey sent a letter to Plaintiff's counsel in which she acknowledged that $7,496.79 was transferred into her account from Plaintiff's account. Dkts. 18 at p. 3, 38 at p. 5. Defendant Surgey then stated $7,600 was transferred without her knowledge or consent to a person named Jacqueline Hunter, who Defendant Surgey claims not to know. *Id*.

---

[9]    During the conversation, Plaintiff's counsel requested that Defendant Craffy provide information from the mortgage lender regarding the foreclosure on his home, but Craffy failed to do so.

Defendant Surgey further claimed that the second wire transfer from Plaintiff's account into her account in the amount of $29,388.99 was returned to Plaintiff at her request. *Id*.[10]

*Plaintiff's Motion to File Third Party Subpoenas Prior to the Rule 26(f) Conference*

On March 27, 2024, Plaintiff filed a Motion seeking leave to file five third party subpoenas to financial institutions seeking to trace the funds sent by Plaintiff to the Defendants. Dkt. 10. At this point no Scheduling Order had been entered authorizing the taking of discovery and no Rule 26(f) conference had been held. In fact, neither Defendant had answered, plead, or otherwise responded to the Complaint even though the time for doing so had passed. Therefore, on April 12, 2024, the undersigned denied Plaintiff's motion and ordered Plaintiff to seek default from the Clerk of Court within seven days pursuant to Fed. R. Civ. P. 55(a). Dkt. 14.

*Clerk's Entry of Default and Plaintiff's First Motion for Default Judgment*

On April 19, 2024, Plaintiff sought entry of default against both Defendants (Dkt. 15) and on April 24, 2024, the Clerk entered default against both Defendants (Dkt. 16). Plaintiff then filed his First Motion for Default Judgment on May 15, 2024, and noticed the motion for a hearing on June 14, 2024. Dkt. 17.

*Defendant Surgey's June 3, 2024 Letter to the Court*

Defendant Surgey sent a letter to the Court dated June 3, 2024, which the Clerk filed on June 7, 2024. Dkt. 20. Defendant Surgey's letter, which purports to be signed by her before a Notary Public, is an apparent response to Plaintiff's Complaint. The letter states that Defendant Surgey is 77 years old and lives on a modest fixed income. *Id*. She claims to have no knowledge of the fraud perpetrated against the Plaintiff. *Id*. She acknowledges the initial transfer of $7,496.79

---

[10]    As discussed below, the undersigned finds by a preponderance of the evidence that Defendant Surgey's self-serving exculpatory statements are false and that she knowingly participated in the scheme to defraud Plaintiff.

6

into her account from Plaintiff's account and states that the funds were withdrawn via CashApp by a person named Jacqueline Hunter. *Id*. Defendant Surgey claims these transactions were conducted without her knowledge and she does not know Ms. Hunter. *Id*. In addition, Defendant Surgey claims the second transfer of $29,388.99 into her account from Plaintiff's account was returned to Plaintiff's account at her instruction. *Id*. Defendant Surgey claims that her account has previously been used without her knowledge to execute a Covid loan-related fraud but curiously does not explain why her account was not closed after that fraudulent conduct was uncovered. *Id*. Defendant Surgey claims she does not know her co-defendant, Mr. Craffy, but through a Google search she knows that "he has pled guilty to 10 counts of financial fraud involving Gold Star families." *Id*. Defendant Surgey then places the blame on the Plaintiff for not realizing earlier that he was the victim of a scheme to defraud. *Id*. Finally, Defendant Surgey states that she is competent but acknowledges she composed this letter with the help of a friend. *Id.*

### *Defendant Craffy's June 12, 2024 Letter to the Court*

Defendant Craffy sent a letter to the Court dated June 12, 2024, which the Clerk filed on June 14, 2024. Dkt. 22.[11] Defendant Craffy's letter requested the Court dismiss Plaintiff's Complaint against him because Craffy claimed that he was a victim of the same fraud. *Id*. Defendant Craffy acknowledged that he had multiple communications with Plaintiff about employment at ARATA Corporation and the purchase of office equipment but claims he was duped as well. *Id*.

---

[11]    The letter was improperly sent to the Court rather than filed with the Clerk's Office. Nevertheless, the undersigned directed the Clerk to file the letter on the docket the day it was received.

However, as the expanded record in this case would later reflect, in his letter to the Court, Defendant Craffy failed to mention that less than two months earlier, on April 16, 2024, he pleaded guilty before the Honorable Georgette Castner, United States District Judge for the District of New Jersey, to ten counts of financial fraud, including six counts of wire fraud (18 U.S.C. § 1343) as well as violations for securities fraud (15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. 240, 10b-5), false statements on a loan application (18 U.S.C. § 1014), acts affecting personal financial interest by a government employee (18 U.S.C. § 208(a)), and false statements (18 U.S.C. § 1001).  *See* DNJ 3:23-cr-541 at Dkts. 1, pp. 24–26.

*The Court's June 14, 2024 Hearing on Plaintiff's First Motion for Default Judgment*

On June 14, 2024, the undersigned held a hearing on Plaintiff's First Motion for Default Judgment against both Defendants.  Dkt. 21.  Plaintiff appeared through counsel, but neither Defendant appeared.  *Id*.  However, given the letters dated June 3 and June 12 filed by the Defendants the undersigned, with the agreement of Plaintiff's counsel, dismissed without prejudice Plaintiff's First Motion for Default Judgment, accepted the Defendants' letters as their Answers to Plaintiff's Complaint, and set the matter down for an in-person status conference on August 2, 2024.  Dkt. 23.

*The District Court's Scheduling Order, the Undersigned's Discovery Order, and the Initial Pretrial Conference*

On July 25, 2024, the Honorable Michael S. Nachmanoff, United States District Judge, entered a Scheduling Order which, among other things, authorized the parties to begin the discovery process.  Dkt. 25.  Shortly thereafter, Plaintiff's counsel served discovery requests on various financial institutions including, Bank of America, Wells Fargo, and First Horizon Bank, which is where Plaintiff and both Defendants held accounts.  Dkt. 38, at p. 6.

The Scheduling Order also set the initial pretrial conference for August 14, 2024, before the undersigned and a final pretrial conference for December 19, 2024, before the District Judge. Dkt. 25. The initial pretrial conference was then continued by less than one week to August 20, 2024, and the parties were given the option of participating by telephone. Dkt. 27. Plaintiff's counsel filed a proposed discovery plan and participated in the initial pretrial conference by phone. Dkt. 29. Neither Defendant appeared at the initial pretrial conference, either in person or by phone. The undersigned entered the Discovery Order on August 20, 2024. Dkt. 30.[12]

*Status Conferences*

By Order dated June 14, 2024, the Court scheduled an in-person status conference on August 2, 2024. Dkt. 23. On August 2, 2024, the Court received a letter from Defendant Surgey dated July 24, 2024, in which she stated that she could not appear in-person for the August 2nd status conference due to a lack of money and transportation. Dkt. 28. The Court received no communication from Defendant Craffy even though he had not yet reported to federal prison. The Court continued the status conference to September 20, 2024 (Dkt. 26), and then again to October 4, 2024, and the parties were given the option to participate in the status conference by phone.

On October 4, 2024, Plaintiff's counsel appeared for the telephonic status conference, but neither Defendant appeared. Dkt. 31. The undersigned then ordered a second status conference to be held in-person on October 18, 2024. Dkt. 32.[13] The undersigned further ordered Plaintiff's counsel to serve the Defendants by email and registered mail with a copy of the Court's Order

---

[12]    It should be noted that on August 21, 2024, a United States District Judge for the District of New Jersey sentenced Defendant Craffy to a total of 151 months imprisonment for 10 counts related to financial fraud, but Defendant Craffy did not report to the Bureau of Prisons until September 20, 2024. *See* DNJ 3:23-cr-541 at Dkts. 31, 32, 37.

[13]    At the time the undersigned issued this Order, the Court was unaware that Defendant Craffy had pled guilty in the District of New Jersey and had reported to the Bureau of Prisons on September 20, 2024.

setting the October 18, 2024,status conference. *Id.* On October 7, 2024, Plaintiff's counsel sent copies of the Order by mail to the Defendants at their last known addresses and by email to the Gmail addresses the Defendants previously used to communicate with counsel and the Court. (Dkt. 34-1). On October 15, 2024, Defendant Surgey contacted Plaintiff's counsel by phone and acknowledged receipt of the Order. *Id.* During this conversation, counsel encouraged Defendant Surgey to engage counsel and again informed her she was required to appear in-person for the status conference. *Id.* On October 18, 2024, Plaintiff's counsel appeared in-person but neither Defendant appeared nor contacted the Court. Dkt. 33. The undersigned then instructed Plaintiff's counsel to seek a second entry of default from the Clerk. *Id.*

*Clerk's Second Entry of Default and Plaintiff's Second Motion for Default Judgment*

On October 18, 2024, Plaintiff sought his second entry of default from the Clerk pursuant to Fed. R. Civ. P. 55(a) on the grounds that the Defendants have failed to "otherwise defend" this action. Dkt. 34. On October 21, 2024, the Clerk entered default as to both Defendants. Dkt. 35. On December 26, 2024, Plaintiff filed his Second Motion for Default Judgment and noticed a hearing for January 10, 2025. Dkt. 37. The Motion and Memorandum in support were served by mail on the Defendants at their respective addresses in Tennessee and New Jersey. *See* Certificate of Service, Dkts. 37, 38. At the January 10, 2025 hearing, the Plaintiff was represented through counsel but neither Defendant appeared nor contacted the Court. Dkt. 40. During the hearing, the undersigned raised "questions about service of process, evidence attributable to each defendant, as well as damages and took the Motion under advisement to issue a report and recommendation to the District Judge." Dkt. 41. The undersigned permitted additional briefing by Plaintiff's counsel on these issues within 30 days, but no other briefs were filed. *Id.*

*The Court's Order of March 13, 2025 and Defendant Surgey's April 2, 2025 Letter to the Court.*

On March 13, 2025, the undersigned entered an Order in response to Plaintiff's Second Motion for Default Judgment (Dkt. 37), in which the Court advised the Defendants of the following:

> [they] are entitled to file an opposition to Plaintiff's Motion for Default Judgment but must do so within twenty-one (21) days of the date of this Order. In their opposition(s), Defendants must identify all facts stated by the moving party with which they disagree and must set forth their version of the facts by offering affidavits (written statements signed by a notary public and under oath) or by filing sworn statements (bearing a certificate that it is signed under penalty of perjury). Should Defendants fail to oppose the Motion for Default Judgment, this Court may enter judgment in favor of Plaintiff. Plaintiff will be entitled to reply to Defendant's brief(s) in opposition within six (6) days of the date that Defendant(s) files their brief(s). *See* Local Civil Rule 7(K) of the Eastern District of Virginia; *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975). Dkt. 42.[14]

This Order was mailed by the Clerk to Defendant Craffy at the Bureau of Prisons facility in which he was being held, but Defendant Craffy never responded to this Order. Dkt. 42. This Order was also mailed to Defendant Surgey at her residence in Tennessee and she responded by letter to the Court dated April 2, 2025, and filed by the Clerk's Office on April 4, 2025. Dkt. 43.[15]  The undersigned will deem the filing timely, but Defendant Surgey's did not include a Certificate of Service indicating the letter had been mailed to Plaintiff's counsel as required by Fed. R. Civ. P. 5 or the Ghostwriting Certificate as required by Local Rule 83.1(N). *Id.*

---

[14]    A *Roseboro* notice was previously provided by Plaintiff's counsel, but the Court provided the *Roseboro* notice through the Order dated March 13, 2025, in accordance with *Milla v. Brown*, 109 F.4th 222 (4th Cir. 2024) and Local Civil Rule 7(K) as amended.

[15]    The letter was improperly sent to the Court rather than filed with the Clerk's Office. Nevertheless, the undersigned directed the Clerk to file the letter on the docket the day it was received.

As with her June 3, 2024 letter to the Court, Defendant Surgey's April 2, 2025 letter, which again purports to have been signed by Defendant Surgey before a Notary Public, states that the initial transfer of $7,496.79 into her account from Plaintiff's account was withdrawn via CashApp over a four-day period by a person named Jacqueline Hunter. *Id*. Defendant Surgey claims these transactions were conducted without her knowledge and she "has no relationship" with Ms. Hunter. *Id*. In addition, Defendant Surgey claims the second transfer of $29,388.99 into her account from Plaintiff's account was returned to Plaintiff's account at her instruction. *Id*. Finally, Defendant Surgey claims she also has "no relationship with" her co-defendant, Mr. Craffy, or with anyone "affiliated with Arata Corporation." *Id*.

## Service of Pleadings on Defendant Craffy while Incarcerated

As a threshold matter, the Court must determine whether a guardian was required to be appointed for Defendant Craffy for proceedings that occurred after September 20, 2024, the date he reported to the Federal Bureau of Prisons to begin his 151-month sentence. The record clearly establishes that Defendant Craffy was properly served with the Summons and Complaint and was given proper notice of all proceedings prior to September 20, 2024, including the mandatory initial pretrial conference held on August 20, 2024, at which Defendant Craffy failed to appear.

However, Federal courts may not enter a default judgment "against a minor or incompetent person" unless that person is "represented by a general guardian, conservator, or other like fiduciary who has appeared." Fed. R. Civ. P. 55(b)(2). Fed. R. Civ. P. 17(b)(1) provides that a natural person's (not acting as a representative) capacity to be sued is determined by the law of that person's domicile. Rule 17(c)(2) further requires a court to "appoint a guardian ad litem—or

issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action."  Fed. R. Civ. P. 17(c)(2).

Because prisoners usually retain the domicile they had before incarceration, *Ownby v Cohen*, 19 F. Supp. 2d 558, 563 (W.D.Va. 1998), and Craffy was domiciled in New Jersey prior to imprisonment, New Jersey law governs whether he qualifies as an incompetent person due to his incarceration. *Commodity Futures Trading Commission v. Tate Street Trading, Inc.*, No. 3:19-cv-690-JAG, 2020 WL 12442918, at *1 (E.D. Va. Aug. 10, 2020) (citing *Nationwide Prop. & Cas. Ins. Co. v. Fraraccio*, No. 1:16-cv-1485-TSE, 250 F. Supp. 3d 5, 6 n.2 (E.D. Va. 2017)).  Unlike Virginia, New Jersey has no requirement that an incarcerated person who is a *pro se* defendant in a civil action is deemed to be incompetent and therefore requires a guardian to be appointed.[16]  *See Liberty Mut. Ins. Co. v. Bullock*, No. A-1694-09T3, 2011 WL 2314392, at *1 (N.J. Super. Ct. App. Div. June 14, 2011) (affirming entry of default judgment against a *pro se* inmate properly served under New Jersey law with a civil complaint where no guardian was appointed and the defendant failed to answer).  For these reasons the undersigned finds the appointment of a guardian for Defendant Craffy was not required as a matter of law.

---

[16]    Under Virginia law, a "person under a disability" includes "a person convicted of a felony during the period he is confined." Va. Code Ann. § 8.01-2. "A suit wherein a person under a disability is a[n] [unrepresented] party defendant shall not be stayed because of such disability, but the court in which the suit is pending . . . shall appoint a discreet and competent attorney-at-law as guardian ad litem to such defendant, whether the defendant has been served with process or not." Va. Code Ann. § 8.01-9(A). However, if the incarcerated felon is represented by counsel who has entered an appearance in the case, the appointment of a guardian ad litem is not required. *Id*. § 8.01-9(B).  There is no similar requirement in New Jersey.

**Jurisdiction and Venue**

The Court must have both subject matter jurisdiction over Plaintiff's claims and personal jurisdiction over the Defendants, and venue must be proper in this judicial district before the Court can render a default judgment.

*Subject Matter Jurisdiction*

The undersigned finds that the Court has proper subject matter jurisdiction over this case. Specifically, the Court has diversity subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. The Complaint asserts an amount in controversy in excess of the $75,000 statutory minimum.[17] 28 U.S.C. § 1332(a). *See* Compl. at p. 14. Furthermore, there is complete diversity of citizenship between the parties, as Plaintiff is a citizen of Virginia, Defendant Surgey is a citizen of Tennessee, and Defendant Craffy is a citizen of New Jersey.[18] Compl. ¶ 6; Dkts. 5, 6. In addition, both Defendants filed letters deemed answers by the Court and neither Defendant challenged subject matter jurisdiction, thereby waiving the issue. *See* Fed. R. Civ. P. 12(b)(1).

*Personal Jurisdiction*

The undersigned finds that the Court has proper personal jurisdiction over both Defendants. The standards of federal due process and the forum state's long-arm statute must be satisfied for a federal court to have personal jurisdiction over a party. *See Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F. 3d 292, 301 (4th Cir. 2012). Federal due process permits

---

[17] The undersigned finds the amount-in-controversy to be claimed in good faith. *Wiggins v. N. Am. Equitable Lif. Assur. Co.*, 644 F. 2d 1014, 1016 (4th Cir. 1981).

[18] Diversity of citizenship is evaluated on the facts as they exist at the time of filing. *Grupo Dataflux v. Atlas Global Group, L.P.*, 541 U.S. 567, 571 (2004). At the time of the filing of this suit, Defendant Craffy was a citizen of New Jersey. The fact that Craffy was subsequently incarcerated in the Bureau of Prisons has no effect on his citizenship for diversity purposes as "prisoners usually retain the domicile they had prior to incarceration." *Ownby v. Cohen*, 19 F. Supp, 2d 558 (W.D. Va. 1998).

personal jurisdiction where a defendant has "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).  The inquiry to find personal jurisdiction requires either specific jurisdiction "based on conduct connected to the suit" or general jurisdiction based on "continuous and systematic" activities in the forum state.  *Tire Eng'g & Distrib.*, 682 F. 3d at 301 (quoting *ALS Scan, Inc. v. Dig. Serv. Consultants, Inc.*, 293 F. 3d 707, 711 (4th Cir. 2002)).  Further, "a defendant should be able to anticipate being brought to court in the forum, in that the contacts must be directed at the forum state in more than a random, fortuitous, or attenuated way." *ePlus Tech., Inc. v. Aboud*, 313 F. 3d 166, 176 (4th Cir. 2002) (internal quotation marks and citation omitted). Virginia's long arm statute, Va. Code Ann. 8.01-328.1, provides for personal jurisdiction to the extent that federal due process permits, thus requiring only one inquiry. *Hilton Franchise Holding, LLC v. HC Southfield LLC*, No. 1:19-cv-610-LO-TCB, 2021 WL 5194109, at *2 (E.D. Va. Mar. 24, 2021), *R&R adopted*, No. 1:19-cv-00610, 2021 WL 5192362 (E.D. Va. Apr. 12, 2021).

In this case, personal jurisdiction over the Defendants is "based on conduct connected to the suit." Here, Plaintiff, the target of the scheme, was in the Eastern District of Virginia at all relevant times, the conspirators, including Defendant Craffy, communicated with Plaintiff while he was in Virginia, emails and documents were sent to Plaintiff in Virginia, and Plaintiff wired money and cryptocurrency to both Defendants from Virginia.  Given that the Defendants and their coconspirators knew Plaintiff was in Virginia and directed the scheme to defraud at Plaintiff while in Virginia makes it reasonable for the Defendants and their conspirators to anticipate being brought into court in this district.

In addition, both Defendants filed letters deemed answers by the Court and neither Defendant challenged personal jurisdiction, thereby waiving the issue. *See* Fed. R. Civ. P. 12(b)(2).

*Venue*

The undersigned finds that venue in this district is proper under 28 U.S.C. § 1391(b)(2). The Eastern District of Virginia is a district in which a "substantial part of the events or omissions giving rise to the claim occurred," as a significant part of the scheme to defraud Plaintiff was executed in this district.[19]

## **Legal Standard**

Fed. R. Civ. P. 55 calls for a two-step process for obtaining a default judgment. First, the plaintiff must request entry of default by the Clerk of Court against the defendant for "fail[ure] to plead or otherwise defend," by which liability is admitted. *See* Fed. R. Civ. P. 55(a); *City of New York v. Mickalis Pawn Shop, LLC*, 645 F. 3d 114, 128 (2d Cir. 2011). Next, the plaintiff must apply to the Court for the actual default judgment, which "converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled…." *Mickalis Pawn Shop, LLC*, 645 F. 3d at 128; Fed. R. Civ. P. 55(b)(2).

"A court confronted with a motion for default judgment is required to exercise sound judicial discretion in determining whether the judgment should be entered, and the moving party is not entitled to default judgment as a matter of right." *JTH Tax, Inc. v. Grabert,* 8 F. Supp. 3d

---

[19]    As stated above, Plaintiff, the target of the scheme, was in the Eastern District of Virginia at all relevant times, the conspirators, including Defendant Craffy, communicated with Plaintiff while he was in this district, emails and documents were sent to Plaintiff in this district, and Plaintiff wired money and cryptocurrency to both Defendants from this district.

731, 736 (E.D. Va. 2014).  On a motion for default judgment, the defendant in default is deemed to have admitted the complaint's non-conclusory "well-pleaded allegations of fact" and the Court is to determine whether those facts state a valid facial claim for relief as a matter of law. *GlobalSantaFe Corp. v. Globalsantafe.com,* 250 F. Supp. 2d 610, 613 n.3 (E.D. Va. 2003); *Grabert*, 8 F. Supp. 3d at 736, 739 (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face); *Burbach Broad Co. of Delaware v. Elkins Radio Corp.*, 278 F. 3d 401, 406 (4th Cir. 2002) (court will "assume the facts alleged in the complaint are true and draw all reasonable factual inferences in [the plaintiff's] favor"). Damages alleged in the Complaint, however, are not deemed admitted by a defaulting defendant: rather, the Court "must make an independent determination regarding damages," including by reliance on affidavits or documentary evidence in the record.  *See Wilcox v. Transmodal Solutions, LLC*, 473 F. Supp. 3d 574, 584 (E.D. Va. 2020) (citation omitted); Fed. R. Civ. P. 8(b)(6).

## Defendants are in Default

*Default Under Federal Rule of Civil Procedure 55(a)*

Based on the failure of the Defendants to defend this action within the meaning of Rule 55(a), the Clerk entered default as to both Defendants.  (Dkts. 60, 67).  Where, as here, a defendant has previously appeared in an action but then "ceased participating in and defending [the] case," by, *inter alia*, "fail[ing] to file any pre-trial submissions as required by the Court's Scheduling Order" and "fail[ing] to appear for the Court's final pretrial conference," the defendant has "clearly failed to 'otherwise defend' [the] case" and may be found in default.  *Allied World Specialty Ins. Co. v. Design Build Mech. Corp.*, No. 1:15-cv-952-TSE-TCB, 2016 U.S. Dist. LEXIS 105664, *5-

6 (E.D. Va. July 21, 2016) (report and recommendation of default judgment), *adopted*, 2016 U.S. Dist. LEXIS 105546 (E.D. Va. Aug. 9, 2016); *accord Johnson v. Robert Shields Interiors, Inc.*, No. 1:15cv820-AJT-TCB, 2016 U.S. Dist. LEXIS 62515, *5-6 (E.D. Va. May 11, 2016) (finding defendant in default due to a failure to appear for final pretrial conference and failure to obey scheduling order or other pretrial order).

Defendant Craffy appeared in this action only by submitting a single letter to the Court dated June 12, 2024, in which he claimed to be a victim of the same fraud as Plaintiff. Dkt. 22. The undersigned treated this letter as an Answer and set in motion the pretrial process. Dkt. 23. However, Defendant Craffy has failed to participate in this case in any manner since June 2024, including failing to appear at the initial pretrial conference on August 20, 2024 (prior to his incarceration) and failing to appear by telephone at the October 18, 2024 status conference (subsequent to his incarceration). Dkts. 30, 33. The undersigned finds that Defendant Craffy's failure to participate in this case over the past 15 months clearly establishes his intent to "cease participating in and defending this case" and is therefore in default.

Similarly, Defendant Surgey participated in this case only by submitting three self-serving letters to the Court. Dkts. 20, 28, 43. The letters, described in detail above, clearly establish that Defendant Surgey does not currently, nor has she ever intended to participate in this action beyond a brief letter writing campaign. As with her codefendant, Defendant Surgey failed to appear at the initial pretrial conference on August 20, 2024, and failed to appear by telephone at the October 18, 2024 status conference. Dkts. 30, 33. The undersigned finds that Defendant Surgey's failure to participate in this case in any meaningful way properly constitutes a failure to defend under Rule 55(a) and she is therefore in default.

*Default as a Sanction Under Federal Rule of Civil Procedure 37*

Alternatively, the undersigned finds default to be appropriate as a sanction against both Defendants pursuant to Fed. R. Civ. P. 37(b)(2)(A)(vi) for their failure to comply with the Rule 16(b) Scheduling Order entered by the Court on August 20, 2024. Dkt. 30. Specifically, the Scheduling Order required both Defendants to file their 26(a) disclosures by September 27, 2024. *Id*. ¶ 3. They failed to do so. In fact, the Defendants have never filed their 26(a) disclosures as required by the Scheduling Order. Fed. R. Civ. P. 37(c)(1)(C) authorizes sanctions under 37(b)(2)(A), including entry of a default judgment, for a violation of a party's 26(a) obligations.

The Fourth Circuit has instructed district courts to apply a four-part test when determining appropriate sanctions under 37(b): "(1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary ...; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions." *Mut. Fed. Sav. and Loan Ass'n v. Richards & Assoc., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989).[20]

The undersigned finds that both Defendants were knowing participants in a scheme to defraud Plaintiff. In addition, the discovery obtained by the Plaintiff and discussed below clearly establishes that both Defendants made materially false statements in their communications with the Court. The clear purpose of these false statements was to delay and obstruct this proceeding. The undersigned finds both Defendants acted in bad faith. The Defendants' failure to comply with the Court's Order and provide the information required by 26(a) has seriously prejudiced Plaintiff's ability to prosecute this case, and to do so in a timely manner. The Defendants have extended their

---

[20]     In *Mutual Federal Savings and Loan Association*, the Fourth Circuit noted that these factors balance a "district court's desire to enforce its discovery orders" and a "party's rights to a trial by jury and a fair day in court." 872 F.2d at 92. However, the Fourth Circuit also emphasized that their review of the district court's determination of default is a "deferential one." See *Young Again Prods., Inc. v. Acord*, 459 F. App'x 294, 301 (4th Cir. 2011).

scheme to defraud, or at least their attempt to conceal their participation in the scheme, to these proceedings and therefore the need to deter noncompliance with Court orders is high. This is particularly true when timely compliance with the Court's Scheduling Order would likely demonstrate the Defendants' liability more quickly and result in a faster resolution of this case. Given the unique facts of this case and the Defendants' pattern of failing to properly litigate this case, there is no less drastic sanction. For these reasons, the undersigned recommends the District Judge render a default judgment against both Defendants pursuant to Rule 37 as well.

**Facts Alleged in the Complaint and Deemed Admitted Based on Defendants' Default**

When a defendant has defaulted, the well-pleaded allegations of facts set forth in the plaintiff's complaint are deemed admitted. *JTH Tax, Inc. v. Grabert*, 8 F. Supp. 3d 731, 736 (E.D. Va. March 26, 2014) (citing *Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780 (4th Cir. 2001)). Here, the undersigned finds the following facts have been properly pleaded in the Complaint and are therefore deemed admitted.[21]

Plaintiff, David Eggleston, is 72 years old and a resident of Fairfax County, Virginia. Compl. ¶¶ 3, 26. On March 25, 2023, Plaintiff was contacted via email by an individual purportedly named Hideyuki Yamada (the "March 25 email"). *Id.*, ¶ 9.[22] The signature line of the March 25 email indicated that the sender, Mr. Yamada, was an Executive Officer, and General Manager of "IT" Planning with the Human Resources Department of ARATA Corporation, a corporate entity based in Japan.[23] *Id.* The March 25 email solicited Plaintiff's application to

---

[21]    Many of these facts are also set forth in Plaintiff's Affidavit which is filed at Dkt 18-1.

[22]    A copy of the March 25 email is attached to the Complaint and incorporated by reference as Exhibit A. *Id.*

[23]    According to ARATA Corporation's website, they are one of Japan's largest wholesale trading companies in the daily goods and cosmetics categories with offices throughout Japan and a head office located in Toyo Koto-ku. *See* https://www.arata-gr.jp/en/. *Id.*

ARATA Corporation for the position of Vice President of United States Operations (the "VP position"). *Id.* The March 25 email went on to explain that ARATA Corporation was a Japanese Corporation, specializing in the wholesale of cosmetics, daily use products, household products, and pet products, seeking to expand its business into United States' markets. *Id.* The March 25 email further described the obligations and duties of the VP position. *Id.* The March 25 email emphasized that the VP position was remote, and Plaintiff could work from anywhere in the United States, Plaintiff's salary would be almost $400,000 annually,[24] and Plaintiff would receive other valuable benefits through his employment. *Id.*

Plaintiff's interest in the VP position was piqued by the unsolicited email of March 25, and Plaintiff responded with expressions of interest in pursuing the position further. *Id.* ¶ 10. Plaintiff was told the next step in the application process was a series of in-depth interviews over Skype. *Id.* Plaintiff participated in the interviews with individuals who identified themselves as Yoshiro Uryuu, Satishi Hiramitsu, and Hideyuki Yamada, and who claimed to be ARATA Executives. *Id.*, ¶¶ 10, 12.

On March 29, 2023, Plaintiff was sent an email from an individual purportedly named Yoshiro Uryu, whose email signature indicated he was a Director and Managing Executive Officer, General Manager of Administration, and General Manager of Human Resources at ARATA Corporation (the "March 29 email"). *Id.*, ¶ 11.[25] The March 29 email included what its sender referred to as a "small test that will help us better understand your workstyle and skills." *Id.* The March 29 email included a number of personal and career-oriented questions about Plaintiff's

---

[24]    All amounts listed in the Report and Recommendation are in US dollars.

[25]    A copy of the March 29 email is attached to the Complaint and incorporated by reference as Exhibit B. *Id.*

employment history, vision for ARATA's future, and values and convictions. *Id.* Plaintiff responded to the questions posed in the March 29 email. *Id.*, ¶ 12.

On April 24, 2023, following the interviews and submission of Plaintiff's responses to the "small test," Plaintiff was sent a purported offer of employment letter (the "Offer Letter") for the position of US President of ARATA. *Id.*, ¶ 12.[26] Although Plaintiff was originally offered the position of Vice President with ARATA Corporation, the Offer Letter offered Plaintiff the position of President with a higher salary than what was previously tendered as well as greater employment benefits. *Id.* The Offer Letter is nine (9) pages, single-spaced, and includes, *inter alia*, a detailed recitation of Plaintiff's job duties and responsibilities, objectives as US President, key relationships, reporting obligations, required work hours, training obligations and dates of training, the legal nature of the employment, terms of vacation, sick, and other types of leave, and employment benefits. *Id.* Plaintiff was offered compensation for accepting the position of President, Plaintiff was offered a salary in the amount of $560,000 annually as well as the possibility that Plaintiff would be eligible for performance-based bonuses. *Id.* The Offer Letter also stated that Plaintiff may need to purchase office supplies or work equipment to perform his duties, but the company would reimburse Plaintiff for these expenses after five (5) working days. *Id.*

Plaintiff accepted the purported offer to be the US President of ARATA. *Id.*, ¶ 13. Plaintiff was then sent an additional document titled "Welcome Aboard" (the "Welcome Letter"), purportedly signed and approved by an individual named Hiroaki Suzaki, whose signature reflects

---

[26]     A copy of the Offer Letter is attached to the Complaint and incorporated by reference as Exhibit C.

that he is a Representative Director, President and CEO of ARATA Corporation. [27]  *Id.*  The Welcome Letter included recommendations concerning employee workspaces to maximize productivity.  *Id.*  The Welcome Letter also noted that Plaintiff would be required to purchase certain office equipment, including a Sonic Wall Advanced Gateway Security Suite, uAttend Biometric Time Clock System for Mac, Dragon Professional Individual – v15, and Polycom RealPresence Group 310, EagleEye IV 12x, 7200-65330-001 for a total price of $7,496.79. *Id.*  There was no mention of any additional equipment Plaintiff would be required to purchase in the Welcome Letter. *Id.*  The Welcome Letter also provided instructions for purchasing the required office equipment while noting that cryptocurrency was the recommended form of payment in part because the transactions were completed instantaneously. *Id.*

Plaintiff again met with an individual over Skype who held himself out to be Yoshiro Uryuu.  *Id.*, ¶ 14.  During this meeting, Plaintiff was instructed to send payment for the required office equipment to Defendant Surgey, a person with whom Plaintiff has never spoken or otherwise communicated with as of the date of filing the Complaint. *Id.*  On April 5, 2023, Plaintiff wired $7,496.79 from his Bank of America account into Defendant Surgey's First Horizon Bank account. *Id.*[28]  In transferring funds from his account into Defendant Surgey's account, Plaintiff relied on information provided to him by the person who identified himself as Mr. Uryuu as well as the representations in the Offer Letter and Welcome Letter that this equipment was required to fulfill the position of President and that Plaintiff would be reimbursed for purchasing the equipment. *Id.*

---

[27]    A copy of the Welcome Letter is attached to the Complaint and incorporated by reference as Exhibit D.

[28]    A copy of the Funds Transfer Request Authorization is attached to the Complaint and incorporated by reference as Exhibit E.  *Id.*

Shortly after Plaintiff's April 5, 2023 wire transfer of $7,496.79 into Defendant Surgey's account, Plaintiff had another Skype call with the individual who held himself out as Yoshiro Uryuu in which Plaintiff was told that the equipment he purportedly purchased for $7,496.79 was insufficient to meet the needs of his new position as President. *Id.*, ¶ 15. During this call, Plaintiff was told he would be required to purchase additional equipment at a total cost of approximately $65,000. *Id.* Plaintiff was also told that Defendant Craffy would be hired by ARATA Corporation as Plaintiff's "direct report." *Id.* Plaintiff had spoken with Defendant Craffy by telephone, text message, and email on several occasions and was assured by Defendant Craffy that he had purchased similar equipment. *Id.*

As a result, on April 10, 2023, Plaintiff wired $29,388.99 from his Bank of America account into Defendant Surgey's First Horizon Bank account, and on April 11, 2023, Plaintiff wired $7,032.98 from his Bank of America account into Defendant Craffy's Chase Bank account. *Id.* ¶ 16.[29] As of April 10, 2023, Plaintiff had wired a total of $43,918.76 directly to Defendants Surgey and Craffy. *Id.*, ¶ 17.

Also on April 10, 2023, Plaintiff purchased $12,500 worth of Bitcoin (0.35150902 BTC) at the Bitcoin Depot in Fairfax County which was instantaneously sent to his electronic Coinbase wallet. *Id.*, ¶¶ 18, 38.[30] Coinbase is a cryptocurrency exchange used to purchase Bitcoin. *Id.*, ¶ 20. The same day, Plaintiff sent a wire transaction from his Bank of America account to Coinbase in the amount of $7,032.98 to purchase additional Bitcoin. *Id.*, ¶ 19.[31] The Bitcoin purchased by

---

[29]     A copy of the Funds Transfer Request Authorizations for these two transactions are attached to the Complaint and incorporated by reference as Exhibit F. *Id.*

[30]     Confirmation of this transaction is attached to the Complaint and incorporated by reference as Exhibit G. *Id.*

[31]     A copy of the Funds Transfer Request Authorizations for this transaction is attached to the Complaint and incorporated by reference as Exhibit H. *Id.*

Plaintiff was to be sent to one of the Defendants' electronic wallets as purported payment for office equipment, but the transaction was not completed because Coinbase deemed the transaction suspicious and froze Plaintiff's account. *Id.*, ¶ 20. Plaintiff's funds remain frozen in his Coinbase account and/or wallet, in the aggregate amount of $19,532. 98. *Id.*

On or about April 11, 2023, individuals purporting to be Yoshiro Uryuu and Satoshi Hidemaki, two of Plaintiff's primary contacts at ARATA Corporation, informed Plaintiff that he needed to purchase a membership in ARATA Corporation's "Executive Membership Program" in order to be placed on ARATA's payroll. *Id.*, ¶ 21. Plaintiff was provided with an information packet, wherein three membership "tiers" were advertised as catering to the diverse needs and aspirations of ARATA Corporation's executive staff. *Id.*[32] Each tier was purported to provide benefits and opportunities designed to support the professional growth of ARATA executives, including Plaintiff. *Id.* The "Platinum Membership" required a one-time payment of $750,000, the "Diamond Membership" required a one-time payment of $1,500,000, and the "Ultimate Membership" was advertised as customized to fit executives' budgets and needs. *Id.*

After wiring payment to Defendant Surgey and Defendant Craffy for the required office equipment, Plaintiff waited for the equipment to arrive at his home, but it never did. *Id.*, ¶ 22. In addition, after Plaintiff had wired payment to the Defendants for the purported required office equipment, Plaintiff's employment starting date and training dates with ARATA Corporation continued to be delayed. *Id.* Given that Plaintiff had yet to receive any of the equipment he had previously been required to purchase and the suspicious circumstances surrounding delays to his start date, Plaintiff declined to purchase any membership package. *Id.*

---

[32] A copy of the Executive Membership information packet provided to Plaintiff is attached to the Complaint and incorporated by reference as Exhibit I. *Id.*

On May 12, 2023, Plaintiff received notification that his Coinbase account had been suspended in connection with Plaintiff's attempted transfer of Bitcoin to Yoshiro Uryuu and the potential that such transfer exhibited the indicia of fraudulent activity. *Id.*, ¶ 23. A letter was sent to Plaintiff by Coinbase's support team explaining the reasons for the suspension of Plaintiff's Coinbase account and providing general information about indications of fraud. *Id.*[33]

Plaintiff subsequently sent a correspondence to the individual purporting to be Yoshiro Uryuu expressing his concerns with how his hiring as U.S. President of ARATA Corporation had transpired. *Id.*, ¶ 24.[34] In Plaintiff's correspondence, Plaintiff reported a call he had received from a Bank of America Fraud Division representative, named Jennifer, notifying Plaintiff that a fraud alert had been placed on his Bank of America accounts. *Id.* The fraud alert was based on Plaintiff's wire transfers to Defendants and cash withdrawals used to purchase Bitcoin. *Id.* Plaintiff did not receive a response from Mr. Uryuu or anyone else purportedly representing ARATA Corporation. *Id.*

In May 2023, Plaintiff contacted ARATA Corporation directly through its website for updates concerning his employment and the required equipment he had yet to receive. *Id.*, ¶ 25. Plaintiff learned that no representative of ARATA Corporation had been in contact with him about any job opportunities and the purported individual representatives of ARATA Corporation that Plaintiff thought he had been speaking to were, in fact, not truly those individuals. *Id.* Plaintiff was further informed that neither Defendant Surgey nor Defendant Craffy were employees of ARATA Corporation. *Id.*

---

[33]    A copy of the letter from Coinbase to Plaintiff is attached to the Complaint and incorporated by reference as Exhibit J. *Id.*

[34]    A copy of Plaintiff's correspondence to Mr. Uryuu is attached to the Complaint and incorporated by reference as Exhibit K. *Id.*

**Analyses of the Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6)**

Before entering default judgment, the Court must evaluate Plaintiff's Complaint against the standards of Fed. R. Civ. P. 12(b)(6) to ensure that the Complaint properly states a claim. *GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. Feb. 5, 2003). Here, the well-pleaded facts in the Complaint clearly establish a scheme to defraud Plaintiff out of money and cryptocurrency.  The facts also establish that both Defendants along with other unidentified individuals executed the scheme to defraud and are liable for the damages they caused. However, the facts alleged in the Complaint and the reasonable inferences drawn from those facts do not support a claim based on a fraudulent inducement of a contractual obligation or an allegation that the Defendants conspired for the *purpose* (emphasis added) of injuring Plaintiff's reputation, trade, business or profession.  Therefore, for the reasons set forth below, the facts properly plead in the Complaint are sufficient under Fed. R. Civ. P. 12(b)(6) to state a claim for actual fraud and conspiracy to commit fraud under Virginia common law, but not fraud in the inducement of a contract or a conspiracy to injure Plaintiff's reputation, trade, business or profession in violation of Va. Code §§ 18.2-499 and 500.

*Virginia Common Law Violation of Fraud in the Inducement of a Contract (Count 1)*

To state a claim for fraud in the inducement under Virginia law (Count 1), a plaintiff must allege facts that if admitted or proven establish the defendant made "misrepresentations [that] were positive statements of fact, made for the purpose of procuring the contract; that they are untrue; that they are material; and that the party to whom they were made relied upon them, and was

27

induced by them to enter the contract." *Enomoto v. Space Adventures, Ltd.*, 624 F. Supp.2d 443, 452 (E.D. Va. 2009) (internal citations omitted).[35]

"Under Virginia law, offer, acceptance and consideration must exist to form a valid contract." *Melo v. Zumper, Inc.*, 439 F. Supp. 3d 683, 696 (E.D. Va. 2020) (citing *Snyder-Falkinham v. Stockburger*, 249 Va. 376, 381, 457 S.E.2d 36, 39 (1995)). A valid contract also requires a meeting of the minds, that is the parties must agree on every material term. *Phillips v. Mazyck*, 273 Va. 630, 636 (2007).

What Plaintiff argues passes for a valid contract is simply the means by which the Defendants and their unidentified coconspirators executed their fraudulent scheme.  There was never a valid contract. The "parties" to the contract are unknown, the offer was made-up, there was never any office equipment to be purchased, and there could not be a meeting of the minds to a fictitious agreement. If Plaintiff's argument were accepted by the Court, then every fraud could be litigated as a breach of contract, and every breach of contract could be charged as fraud. The facts alleged in the Complaint are beyond the scope of what constitutes common law fraud in the inducement.  For these reasons, undersigned finds Count 1 fails to state a claim for relief.

*Virginia Common Law Violation of Actual Fraud (Count 2)*

To state a claim for actual fraud under Virginia law (Count 2), a plaintiff must allege facts that if admitted or proven establish the defendant knowingly and intentionally made a false representation of a material fact with intent to mislead, and reliance by the party misled resulting in damages to the party misled. *Brown v. Gilner*, No. 1:10-cv-00989 (E.D. Va. Sep. 25. 2012)

---

[35]    While fraudulent inducement is normally a breach of contract defense, it can also support a cause of action for damages.  *George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 220 Va. 109, 112 (1979)(citing *Jordan v. Walker*, 115 Va. 109 (1913)) ("Fraud in the inducement of a contract is also grounds for an action for damages in a court of law.").

(*citing Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (1994)). A finding of actual fraud also requires "clear and convincing evidence that one has represented as true what is really false, in such a way as to induce a reasonable person to believe it, with the intent that the person will act upon this representation." *Id.* (citing *McMillion v. Dryvit Sys., Inc.*, 262 Va. 463, 471 (2001) (internal quotation marks omitted)). A promise may constitute a misrepresentation of present fact and support a claim for actual fraud if the defendant had no intention of performing at the time the promise was made. *Id.* (citing *Supervalu, Inc. v. Johnson*, 276 Va. 356, 368 (2008) (internal quotation marks omitted)). Additionally, fraud by nondisclosure requires "evidence of a knowing and deliberate decision not to disclose a material fact." *Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 368 (2003) (citing *Lambert v. Downtown Garage*, 262 Va. 707, 714 (2001)).

Plaintiff has properly and persuasively pleaded facts that support a violation of common law fraud. The schemers used a seemingly professional and sophisticated "hiring process" to trick Plaintiff into believing that he had been hired into a high-paying executive position with a reputable Japanese company. Dkt. 1, ¶¶ 9-13. The identities of the schemers who targeted Plaintiff, communicated with Plaintiff pretending to be real ARATA employees, orchestrated a fictitious hiring process, and convinced Plaintiff to send them payment for office equipment is unknown. There is no allegation that Defendant Surgey played any of these roles. There is a properly pleaded fact – deemed admitted – that Defendant Craffy played an important role in convincing Plaintiff to front the costs of office equipment, but otherwise no evidence that he was an architect of this conspiracy. *Id.* ¶ 15.

Nevertheless, the facts alleged and the reasonable inferences to be drawn from those facts establish that the Defendants were knowingly working in concert with each other and with others to execute the fraud as well as transfer and conceal the proceeds of the fraud. Defendant Surgey

and Defendant Craffy allowed their personal accounts to be used to launder the proceeds of the fraud. (*Id*., ¶¶ 14,16). In so doing, they would have provided their account information to their co-schemers who were directing Plaintiff where to transfer his money and then accepted Plaintiff's money without question. The Defendants were clearly trusted by the other members of the conspiracy to collect and disburse proceeds of the fraud. For these reasons, undersigned finds Count 2 properly states a claim for common law fraud.

*Civil Conspiracy to Injure Reputation, Trade, Business or Profession in Violation of Va. Code §§ 18.2-499 and 500 (Count 3)*

To state a claim for civil conspiracy to injure in violation of Va. Code §§ 18.2-499 and 500 (Count 3), a plaintiff must allege facts that if admitted or proven establish the defendant and at least one other person did "combine, associate, agree, mutually undertake or concert together for the purpose of willfully and maliciously injuring another in his reputation, trade, business or profession by any means." The purpose of the scheme was to defraud Plaintiff out of money and property, and not injure his reputation, trade, business or profession. Injury to Plaintiff's reputation or professional prospects may be an unfortunate collateral consequence of the Defendants' actions, but it was not the purpose of their conspiracy. Therefore, undersigned finds the Complaint fails to state a claim for relief for a violation of Va. Code §§ 18.2-499 and 500.

*Common Law Conspiracy to Commit Fraud (Count 3)*

Plaintiff also alleges common law civil conspiracy to commit a tort as an alternative theory of liability to the more narrowly defined statutory civil conspiracy set forth in Va. Code §§ 18.2-499 and 500. A common law civil conspiracy requires the plaintiff to allege facts that if admitted or proven establish the defendant and at least one other person combined to accomplish, by some concerted action, the commission of a tort and acts committed in furtherance of the conspiracy

resulted in damages to the plaintiff. *Gelber v. Glock*, 293 Va. 497 (2017) (internal citations omitted).

Here, the underlying tort is the actual fraud as alleged in Count 2. The same facts that establish actual fraud in Count 2 also establish a common law conspiracy to commit actual fraud in Count 3. The Complaint sufficiently alleges the existence of a conspiracy, that the Defendants were members of the conspiracy, that is they acted in concert with one another and others to defraud Plaintiff, that Plaintiff was in fact defrauded by members of the conspiracy and that Plaintiff suffered actual damages as a result of the conspiracy. Therefore, the undersigned finds Count 3 properly states a claim for common law conspiracy to commit fraud.

### Additional Evidence in the Record

The undersigned finds that the well-pleaded facts set forth in the Complaint standing alone are sufficient to satisfy the 12(b)(6) standard as to each count and to both Defendants. However, the undersigned finds it appropriate to take judicial notice of pleadings and Court Orders regarding Defendant Craffy's conviction in the District of New Jersey of ten counts of financial fraud and the actions of Defendant Surgey that were uncovered through the discovery process after the Complaint was filed in order to properly assess their level of culpability, the truthfulness of representations they made to the Court, and the appropriate damages.

"The Federal Rules of Civil Procedure expressly permit a court, in granting a default judgment, to consider extrinsic evidence to, among other reasons, 'establish the truth of any allegation.'" *In re Wolf*, 644 B.R. 725, 755 (N.D. Ill. 2022). While some courts hold that a court should not look beyond the "four corners of the complaint" in assessing liability under Rule 55(b)(2) based on the rationale that "a defendant should be able to review a complaint, and, if it is confident that the complaint fails to state a claim for relief, elect to conserve its resources and not

defend the case," the undersigned finds that "this rationale does not apply with great force" where a movant properly serves extrinsic evidence relied upon in the default judgment motion such that "it would not be unfair to say that [defendant] should have reassessed the strength of [plaintiff's] case upon receipt" of the evidence. *See Ayers v. Receivables Performance Management, LLC*, 2016 WL 5402962, at *5 (E.D. Mich. Sept. 28, 2016) (collecting cases); *United Staes v. Bayley*, 2023 WL 3093126, at *6 n.4 (W.D. Wash. April 27, 2023) (considering photographs submitted in support of motion for default judgment, which was properly served with the motion for default judgment by ECF, email, and mail, based on *Ayers*); *Gomez v. El Rancho de Andres Carne de Tres Inc.*, 2014 WL 1310296, at *4 (E.D.N.Y. March 11, 2014) ("[m]oreover, it would be inefficient to require Plaintiff to file an amended complaint to add the additional allegations contained in his affidavit [because Rule 5(a)(2) excuses service of such an amended complaint on a defendant in default]). Here, the extrinsic evidence was both known to the Defendants and attached as exhibits to Plaintiff's Second Motion for Default Judgment that was served on Defendants by mail in accordance with Rule 5(b)(2)(C). Dkts. 20, 38.

The undersigned also finds that facts admitted in Craffy's criminal case, and the Court Orders issued in that case by a United States District Judge are relevant to Plaintiff's Second Motion for Default Judgment and are properly subject to judicial notice for the truth of the matters they assert. *See, e.g.*, *Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F. 3d 1074, 1081 (7th Cir. 1997) (judicial notice of adjudicative fact in court records may be appropriate if "not subject to reasonable dispute" and either "generally known within the territorial jurisdiction of the trial court" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned").

*Defendant Craffy's Federal Conviction for Financial Fraud*

On July 6, 2023, Defendant Craffy was indicted by a grand jury sitting in the District of New Jersey with ten counts of financial fraud, including six counts of wire fraud (18 U.S.C. § 1343) as well as violations for securities fraud (15 U.S.C. §§ 78j(b), 78ff; 17 C.F.R. 240, 10b-5), false statements on a loan application (18 U.S.C. § 1014), acts affecting personal financial interest by a government employee (18 U.S.C. § 208(a)), and false statements 18 U.S.C. § 1001). *See* DNJ 3:23-cr-541 at Dkt. 1.  According to the Indictment, Defendant Craffy was a former U.S. Army financial counselor. *Id.*  The scheme to defraud was centered on Defendant Craffy's false representations to Gold Star Families to induce them to invest their survivor benefits in brokerage accounts that Defendant Craffy controlled and from which he received lucrative commissions, even when the investments resulted in substantial losses to the victims. *Id.*[36]  On April 16, 2024, Defendant Craffy pleaded guilty before the Honorable Georgette Castner, United States District Judge for the District of New Jersey, to all ten counts of the Indictment. *Id.*, Dkts. 24-26.

On August 21, 2024, the Court sentenced Defendant Craffy to a total of 151 months imprisonment. *Id.*, Dkts. 31, 32. On August 21, 2024, the Court entered a Forfeiture Order in the amount of $1,482,741.41.  Dkt. 33. On January 7, 2025, the Court entered a Restitution Order in the amount of $1,593,642.07 to be divided among 12 victims. Dkt. 38.  Defendant Craffy appealed the sentence imposed by the District Judge, but the Court of Appeals for the Third Circuit affirmed the trial Court. *Id.*, Dkt. 44.

---

[36]    A Gold Star Family is a term used to reference a family who has lost an immediate family member while serving in the armed forces of the United States during any period of war or hostilities in which the armed forces of the United States were engaged.  https://www.army.mil

*Third Party Discovery Served by Plaintiff*

Once the Court's Scheduling Order (Dkt. 25) authorized the parties to begin the discovery process, Plaintiff's counsel served discovery requests on various financial institutions including First Horizon Bank where Defendant Surgey maintained the account that received the April 5, 2023 wire transfer from Plaintiff in the amount of $7,496.79, and the April 10, 2023 wire transfer from Plaintiff in the amount of $29,388.99. Compl. ¶¶ 13-16. In response to a discovery request, First Horizon Bank produced a Suspicious Activity Report ("SAR") associated with these transactions and attached to Plaintiff's Motion as Exhibit E. Dkt. 38, Ex. E. The SAR states that the purpose of the April 5 wire transfer was designated as "Pop Operating Expenses Areata Corp." and similarly the April 10 wire transfer was designated as "Pop Operating Expenses." *Id.* The SAR also states that on April 13, 2023, Defendant "Surgey entered [a First Horizon Bank branch] and requested to send a wire to her boyfriend . . . in Germany working on an oil rig and the funds that she received were for a settlement from an accident that happened to the boyfriend and now she needed to get that money to him." (*Id.*). The bank identified this as a potential fraud and declined to send the wire. *Id.* Defendant Surgey then "requested the money be withdrawn in cash and she would send it to him via Bitcoin." *Id.* The bank again declined and reversed the April 10 wire transfer transaction, sending $29,388.99 back into Plaintiff's Bank of America account.[37] *Id.* The bank closed Defendant Surgey's account on May 3, 2023 with a balance of $262.56.[38] *Id.*

---

[37] The return of these funds was not specifically mentioned in the Complaint. It does appear however, that these funds were then sent by Plaintiff to Defendant Craffy. Dkt. 38 at p. 8.

[38] The undersigned also notes that Defendant Surgey opened the First Horizon account on January 3, 2023, only slightly more than four months before the fraudulent transfers from Plaintiff.

## **Defendants' Role in the Scheme to Defraud Plaintiff**

Based upon properly plead facts in the Complaint, Plaintiff has clearly established the existence of a scheme to defraud him of money and cryptocurrency. The next issue for the undersigned to address is the roles and level of culpability of the Defendants in this scheme. Based on the allegations in the Complaint deemed admitted as well as additional evidence in the record, the undersigned finds that Plaintiff has carried his burden to establish by a preponderance of the evidence that Defendants Craffy and Surgey were knowing participants in this scheme to defraud Plaintiff and not victims or unwitting instruments of other criminal actors.

In his June 12, 2024 letter, which the Court deemed an Answer to the Complaint, Defendant Craffy claimed that he too was a victim of the same scheme to defraud. Dkt. 22. However, Defendant Craffy failed to disclose that at the time he wrote the letter he had pleaded guilty and was pending sentencing for ten counts of financial fraud. These crimes, according to the indictment, ended in January 2023, just two months before the fraud perpetrated against Plaintiff began. Although the undersigned does not consider Defendant Craffy's federal fraud conviction evidence that he committed this civil fraud, the Court does consider it, along with his professional background as a financial advisor, as evidence that he was not duped by others into unknowingly participating in the fraud of Plaintiff.

As to Defendant Surgey, she made false statements to the bank regarding the source of the funds as well as to whom she intended to send the money and why. These falsehoods are evidence of Defendant Surgey's efforts to conceal the fraudulent scheme and support the finding that she knowingly participated in the scheme to defraud Plaintiff. In addition, Defendant Surgey stated in her letters to the Court dated June 3, 2024 (Dkt. 20) and April 2, 2025 (Dkt. 43) that she requested the April 10 wire transfer transaction to be reversed and the $29,388.99 sent back into Plaintiff's

Bank of America account. *Id.* The undersigned finds these statements to the Court to be untrue. Defendant Surgey also stated in her letters to the Court that she has no association with Defendant Craffy. *Id.* However, when the bank reversed the $29,388.99 wire from Defendant Surgey's account, the money was quickly redirected to Defendant Craffy, clearly suggesting a coordinated effort between the two Defendants. Even more persuasive, however, is the fact that Defendant Surgey, or someone pretending to be Defendant Surgey, accepted process for Defendant Craffy at his residence in New Jersey. Regardless of whether it was actually Defendant Surgey who accepted process on behalf of Defendant Craffy, the mere fact that someone used her name before Craffy was served with the Complaint is evidence of an association between the two Defendants, an association which they both attempted to conceal.

For these reasons the undersigned finds that Defendant Craffy and Defendant Surgey knowingly, willfully and maliciously acted in concert with each other and with others to defraud Plaintiff. Regardless of the precise roles they played, the evidence clearly establishes that both Defendants were instrumental in executing the scheme to defraud Plaintiff.

## **Remedies**

The remedies for common law fraud (Count 2) and conspiracy to commit common law fraud are the same (Count 3) and merge for purposes of this analysis.[39] As to these claims, Plaintiff seeks compensatory damages, punitive damages, an award of prejudgment and post-judgment interest, as well as attorney's fees and costs.[40] (Dkt. 38 at p. 18).

---

[39] Common law conspiracy to commit a tort permits the Court to impute damages caused by one member of the conspiracy to other members of the conspiracy. *Gelber v. Glock*, 293 Va. 497 (2017)

[40] The undersigned will not address the remedies sought for fraud in the inducement of a contract (Count 1) or conspiracy to injure in violation of Va. Code §§ 18.2-499 and 500 (as alleged in Count 3) because the undersigned recommends the Court dismiss those claims.

*Compensatory Damages*

Plaintiff seeks compensatory damages in the amount of $63,451.74.  Compl. at p. 14; Dkt. 38 at p. 15.  This amount consists of the following:

$7,496.79 wired from Plaintiff's Bank of America account to Defendant Surgey's First Horizon Bank account on April 5, 2023 (Compl. ¶ 14);

$29,388.99 wired from Plaintiff's Bank of America account to Defendant Surgey's First Horizon Bank account on April 10, 2023 (Compl. ¶ 16);

$7,032.98 wired from Plaintiff's Bank of America account to Defendant Craffy's Chase Bank account on April 11, 2023 (Compl. ¶ 16);

$12,500 used to purchase Bitcoin that is currently frozen in Plaintiff's Coinbase wallet (Compl. ¶ 18, 20);

$7,032.98 used to purchase Bitcoin that is currently frozen in Plaintiff's Coinbase wallet. (Compl. ¶ 19-20).

Although the evidence now shows that the April 10, 2023 wire transfer in the amount of $29,388.99 was returned to Plaintiff, the Plaintiff asserts that he then converted those funds to cashier's checks of approximately $14,000 and $15,000 and sent them to Defendant Craffy.  Dkt. 38 at p. 8.

To date, Plaintiff's actual loss is $63,451.74 and the undersigned recommends the Court award compensatory damages in that amount and both Defendants be held jointly and severally liable for the full amount.  The undersigned also recommends the Court order Coinbase to return to Plaintiff the $19,532.98 in Bitcoin frozen in Plaintiff's Coinbase wallet.[41]  If Coinbase returns

---

[41]    Although not specifically requested by Plaintiff, including such a provision in the Court's Order would be consistent with Plaintiff's request to "[g]rant such other relief as this Court may consider just and proper." (Dkt. 1 at p. 15).

Plaintiff's Bitcoin, then the Defendants shall be given a credit toward the compensatory damages award in the amount returned, but not to exceed $19,532.98.

*Punitive Damages*

In this diversity action, Plaintiff is entitled to punitive damages under Virginia law when there is misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of another. *See Hamilton Dev. Co. v. Broad Rock Club, Inc.* 248 Va. 40, 45 (1994); *Simbeck Inc. v. Dodd Sisk Whitlock Corp.*, 257 Va. 53, 58 (1999). However, pursuant to Va. Code § 8.01-38.1 the total amount awarded for punitive damages may not exceed $350,000.

Here, the Defendants played integral roles in executing a sophisticated scheme to defraud an elderly victim out of a significant amount of money. The Defendants exhibited a callous and malicious disregard for the rights and property of the Plaintiff. The Defendants attempted to conceal their conduct and in doing so made materially false statements to the Court. Given the full record in this case, the undersigned recommends the Court award Plaintiff a total of $350,000 in punitive damages. The undersigned finds that Defendant Craffy played a more active role in the scheme and therefore has a greater degree of culpability than Defendant Surgey. Therefore, the undersigned recommends the Court find Defendant Craffy to be liable for the full $350,000 punitive damages award and Defendant Surgey to be jointly and severally liable for $75,000 of the punitive damages award.

*Prejudgment Interest*

Plaintiff seeks an award of prejudgment interest. "Virginia law governs the award of prejudgment interest in a diversity case." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 633 (4th Cir. 1999); *United States v. Dollar Rent A Car Sys., Inc*., 712 F.2d 938, 940 (4th Cir. 1983) ("Courts have held that state law applies to questions involving prejudgment interest in

diversity cases.") (internal citations omitted).  Under Virginia law, a district court may award prejudgment interest, in its discretion, by weighing the "equities in a particular case to determine whether an award of prejudgment interest is appropriate."  *See* Va. Code § 8.01-382; *Moore Bros. Co. v. Brown & Root, Inc*., 207 F.3d 717, 727 (4th Cir. 2000).  The rationale behind awarding prejudgment interest "is to ensure that an injured party is fully compensated for its loss."  *City of Milwaukee v. Cement Div., Nat'l Gypsum Co*., 515 U.S. 189, 196 (1995).  District courts have discretion with regard to the interest rate and the date at which interest begins to accrue. *World Fuel Servs. Trading, DMCC v. M/V HEBEI SHIJIAZHUANG*, 12 F. Supp. 3d 810, 813 (E.D. Va. 2014) (internal citations omitted).

Given that the Defendants benefited from the unlawful taking of Plaintiff's money, the undersigned finds the equities weigh in favor of ordering prejudgment interest on the award of compensatory damages beginning April 15, 2023, the date by which Plaintiff had paid the full $63,451.74 to the Defendants and their conspirators.  As to the amount of prejudgment interest, Va. Code § 6.2-302 sets the rate at 6% annually.

*Post-Judgment Interest*

The undersigned also finds that an award of post-judgment interest is appropriate.  A court shall order post-judgment interest "on any money judgment in a civil case recovered in a district court."  28 U.S.C. § 1961(a).  *ExxonMobil Oil Corp. v. Black Stone Petroleum Inc*., 221 F. Supp. 3d 755, 769 (E.D. Va. 2016), *judgment entered*, No. 1:16-CV-148, 2016 WL 6657395 (E.D. Va. Nov. 9, 2016) (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F. 2d 1017, 1031 (4th Cir. 1993) ("federal law mandates the awarding of post judgment interest")); *PharMecia East, LLC v. Healthlink of Va. Shores, LLC*, 2020 WL 877983, at *3 (E.D. Va. Feb. 20, 2020) ("In the Fourth Circuit, post-judgment interest can be awarded on the entire amount the court awards.") (internal

citations omitted); *Barrella v. Village of Freeport*, 43 F. Supp. 3d 136, 195 (E.D.N.Y. 2014) ("Post judgment interest is available for an award of attorneys' fees arising out of a judgment in the district court.") (internal quotation marks and citations omitted).  The undersigned finds that entitling Plaintiff to post-judgment interest is appropriate to ensure that Plaintiff receives the proper value of the damages awarded against Defendants, regardless of when Plaintiff may be able to collect such damages.  The post-judgment interest is to be calculated in accordance with 28 U.S.C. § 1961.

### Attorney's Fees and Costs

Plaintiff seeks a total of $38,129.50 for attorney's fees and costs.  Dkt.38-6.  Generally, Virginia follows the "American Rule," which provides that, absent a specific contractual or statutory provision to the contrary, attorney's fees are not recoverable by a prevailing party. *Gilmore v. Basic Industries*, Inc. 233 Va. 485 (1987).  However, there are exceptions.  In *Prospect Development Co., Inc. v. Bershader*, 258 Va. 75 (1999), the Supreme Court of Virginia held that "in a fraud suit, a chancellor, in the exercise of his discretion, may award attorney's fees to a defrauded party. When deciding whether to award attorney's fees, the chancellor must consider the circumstances surrounding the fraudulent acts and the nature of the relief granted to the defrauded party."  In *Bershader*, the Court upheld an award of attorney's fees where the "defendants engaged in callous, deliberate, [and] deceitful acts." *Id*.  *See also St. John v. Thompson*, 299 Va. 431 (2021).[42]  It is clear that the Defendants here "engaged in callous,

---

[42] Even assuming *Bershader* and *St. John* apply solely to actions in equity, the undersigned finds that the distinction between law and equity under Virginia law is not dispositive in a case brought in federal court, even when jurisdiction is based on diversity.

deliberate, [and] deceitful acts" such that the undersigned recommends the Court award attorney's fees.[43]

Plaintiff's counsel has submitted an affidavit in support of his request for fees and costs. Dkt. 38-6. The undersigned has carefully reviewed the affidavit and finds the requested fees and costs to be reasonable. Plaintiff's lead counsel has over 13 years of experience in litigating complex civil matters and charges a rate of $350 per hour. Counsel also supervised an associate with more than five years of legal experience who charges $295 per hour and a paralegal who charges $65 per hour. Moreover, the 34 hours for lead counsel, 85.80 hours for associate counsel, and 4.6 hours for paralegal assistance are entirely appropriate given the nature and complexity of this case. Finally, Plaintiff has requested costs for a filing fee in the amount of $405, $96 for service of process on one Defendant and $72.50 for service of process on the other Defendant, as well as $46 in Federal Express costs for mailing documents to the Defendants. The undersigned finds these costs to be necessary and appropriate.

For these reasons, the undersigned recommends the Court award Plaintiff a total of $38,129.50 for attorney's fees and costs and that the Defendants be jointly and severally liable for this amount.

## Findings and Recommendations

For the foregoing reasons, the undersigned United States Magistrate Judge recommends that Plaintiff's Second Motion for Default Judgment (Dkt. 37) be **GRANTED IN PART** and **DENIED IN PART** as to Defendant Cathy Surgey and Defendant Caz Craffy. Specifically, the undersigned recommends that the Court:

---

[43] The undersigned also notes that the elderly Plaintiff in this case would have to spend more than half of the compensatory damages award simply to pay his attorney's fees and costs.

- **DENY** Default Judgment as to Defendant Cathy Surgey and Defendant Caz Craffy on Count 1 (Common Law Fraud in the Inducement of a Contract);

- **GRANT** Default Judgment as to Defendant Cathy Surgey and Defendant Caz Craffy on Count 2 (Common Law Actual Fraud);

- **DENY** Default Judgment as to Defendant Cathy Surgey and Defendant Caz Craffy on Count 3 (Civil Conspiracy to Injure Reputation, Trade, Business or Profession in Violation of Va. Code §§ 18.2-499 and 500);

- **GRANT** Default Judgment as to Defendant Cathy Surgey and Defendant Caz Craffy on the alternative theory alleged in Count 3 (Common Law Conspiracy to Commit Fraud);

- **AWARD** compensatory damages in the amount of $63,451.74 for which both Defendants are jointly and severally liable;

- **ORDER** Coinbase to return to Plaintiff the $19,532.98 in Bitcoin frozen in Plaintiff's Coinbase wallet.  If Coinbase returns Plaintiff's Bitcoin, then the Defendants shall be given a credit toward the compensatory damages award in the amount returned, but not to exceed $19,532.98.

- **AWARD** punitive damages in the amount of $350,000 for which Defendant Caz Craffy is jointly and severally liable for the full amount, and Defendant Cathy Surgey is jointly and severally liable for $75,000;

- **AWARD** prejudgment interest on the compensatory damages award of $63,451.74 from April 15, 2023 to the date the final judgment is entered for which both Defendants are jointly and severally liable;

- **AWARD** post-judgment interest on the full award for which both Defendants are jointly and severally liable;

- **AWARD** attorney's fees and costs in the amount of $38,129.50 for which both Defendants are jointly and severally liable; and

- **DISMISS** this civil action in all other respects.

### Notice

The Clerk of Court is directed to serve forthwith a copy of this Report and Recommendation by mail on Defendant Cathy Surgey at her last known address and on Defendant Caz Craffy at the Bureau of Prisons. The parties are advised that objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636 and Rule 72(b) of the Federal Rules of Civil Procedure, must be filed within fourteen (14) days of its service. Failure to object to this Report and Recommendation waives appellate review of any judgment based on it.

*William E Fitzpatrick*
WILLIAM E. FITZPATRICK
United States Magistrate Judge

September 17, 2025
Alexandria, Virginia